## Richmond

LOREN PRITCHARD GUY v. FRANCES ALEXANDRA GUY.

March 9, 1970.

Record No. 7059.

Present, All the Justices.

*James D. Davis (E. W. McCaul; E. C. Wingfield; McCaul, Grigsby and Pearsall; Wingfield, Barrick & St. John, on brief), for appellant.*

*E. Gerald Tremblay (Tremblay, Colmer & Smith, on brief), for appellee.*

SNEAD, C.J., delivered the opinion of the court.

On March 6, 1967, Dr. Loren Pritchard Guy filed a bill of complaint against his wife, Frances Alexandra Guy, in which he sought a divorce from the bond of matrimony on the ground that the parties had lived separate and apart without any cohabitation and without interruption for two years, as provided by Code, § 20-91 (9). After hearing evidence *ore tenus*, the chancellor by a decree

entered April 11, 1968, granted the parties a divorce *a vinculo matrimonii*, held that Dr. Guy without just cause willfully deserted and abandoned Mrs. Guy on or about March 3, 1965, and awarded Mrs. Guy alimony and attorney's fees. In addition, the chancellor decreed that all of the furniture and furnishings being used in the home at Keswick, Virginia, were the sole property of Mrs. Guy.

Dr. Guy contends in this appeal that the chancellor erred (1) in awarding alimony as the evidence was insufficient to establish that he deserted and abandoned Mrs. Guy, and (2) in determining the ownership of personal property.

The evidence showed that the parties were married in 1940. Dr. Guy was then and at the time of the divorce a widely known ophthalmologist practicing in New York City. Two sons, Fraser and Colin, and a daughter, Yvonne, were born of the marriage. The family lived until 1955 at Irvington, New York, in a home owned by Mrs. Guy.

In 1955 Dr. Guy purchased a farm of approximately 131 acres known as Fravon at Keswick, Albemarle County, Virginia. The property was conveyed to Mrs. Guy and the family moved there. Substantial improvements were made to the farm such as the renovation of the 18 room antebellum house. It was Dr. Guy's intention to raise cattle, to breed and train thoroughbred horses on the farm and to have a place for his future retirement.

For ten years, between 1955 and 1965, the family lived at Fravon but Dr. Guy continued his medical practice in New York, and while there, used a room adjoining his office as his living quarters. He visited his family at Fravon on weekends and holidays. Such visits were at least once a month.

In January 1965, Dr. Guy received a telephone call in New York from a young man named Peter Baraban, who expressed his desire to marry Dr. Guy's daughter, Yvonne. Not being acquainted with Peter, Dr. Guy called his wife and was advised that Peter was a former classmate of their son Fraser at the University of Virginia and that Yvonne had met Peter through that relationship. Arrangements were made to meet Peter and his parents. The Barabans visited Fravon at Dr. Guy's invitation in the spring of 1965 in order that the two families might become better acquainted and to make plans for the wedding.

On March 4, 1965, while the Barabans were still at Fravon, Dr. Guy ate some food that caused him to become ill and he decided

to return to New York. He was driven to the bus station by his wife where he purchased a roundtrip ticket. On his departure the couple kissed goodbye.

After returning to New York, Dr. Guy became suspicious of the Barabans and had them investigated. He discovered that they had several judgments against them and that they associated with disreputable people. He also received information detrimental to Peter. Dr. Guy testified that he communicated this information to his wife and urged that she intervene to stop the pending wedding. Mrs. Guy denied receiving the information and stated that even if she had she could not have prevented her 21-year old daughter from marrying Peter Baraban.

On June 5, 1965, Peter and Yvonne were married in New York. Dr. Guy did not attend the wedding because he disapproved of it. The next day Dr. Guy entered a New York hospital and underwent surgery. He was hospitalized for eight days. No member of his family visited him but there was testimony that Dr. Guy had not informed his family when or where the operation was to take place. After he was discharged from the hospital he stayed with a friend in New York to recuperate rather than at Fravon. He stated that he was apprehensive for his personal safety since the Barabans had learned what he had discovered from his investigation of them and that while recuperating he wanted peace and quiet that he could not get if the Barabans were at Fravon.

According to Dr. Guy, in July 1965, upon learning that his wife had given her consent for the minor son, Colin, to spend the summer in Mexico with Peter and Yvonne, he sent Mrs. Guy a telegram requesting that she have Colin return home immediately.

On July 22, 1965, Dr. Guy, by prearrangement, met Russell Wilde, a family friend who was his New York attorney, in Charlottesville where they consulted with Dr. Guy's local attorney. Dr. Guy testified that he and Wilde spent that night in a hotel in order to avoid the Barabans if they were at Fravon. The next day he and Wilde drove to Fravon, a short distance from Charlottesville. None of the Barabans was there and they had not been guests since shortly after the wedding in June. After a brief conversation with Mrs. Guy concerning her alleged failure to cooperate to prevent the wedding and their son Colin's visit to Mexico, Dr. Guy collected some of his personal possessions and put them in his car. According to Wilde, Mrs. Guy invited them to spend the night in

the guest room. However, the testimony of Mrs. Guy indicates that the invitation to stay in the guest room was intended only for Wilde. Shortly thereafter Dr. Guy and Wilde left the premises and returned to the hotel in Charlottesville.

Between March 4, 1965 and July 23, 1965, Dr. and Mrs. Guy did not see each other. She testified that there were no direct communications between them during this period.

On July 27, 1965, Dr. Guy instituted a suit for a divorce on the ground of desertion in the Circuit Court of Albemarle County. This suit was later dismissed on his motion and the present one was commenced.

The decree provided that Dr. Guy pay Mrs. Guy the sum of $225 per week as alimony. In oral argument before us, counsel for Dr. Guy stated that a further hearing had been held by the chancellor on the amount of the alimony that resulted in a reduction of the award to $155 per week.

Dr. Guy contends, however, that the chancellor erred in awarding any alimony based on a finding that he deserted his wife "on or about March 3, 1965". He argues that the evidence clearly falls short of showing that he had any intention of deserting and abandoning her when he returned to New York City on March 4, 1965, and that his prolonged absence from Fravon was adequately explained. He points out that the requirements of his medical practice in New York and his temporary illness were the only reasons for his departure.

Even if we assume that the evidence is not sufficient to establish that Dr. Guy deserted his wife, this fact standing alone is not enough to relieve him of the obligation to support her. In *Mason v. Mason*, 209 Va. 528, 165 S.E.2d 392 (1969) we held in effect that when a divorce is granted under Code, § 20-91(9), providing for divorce without fault when the parties have lived separate and apart without any cohabitation and without interruption for two years, the husband is not relieved of the obligation to support his wife unless it be shown that the separation was caused by her fault or misconduct. As we said in *Stolfi v. Stolfi*, 203 Va. 696, 701, 126 S.E.2d 923, 927 (1962), "[O]ne spouse is not justified in leaving the other unless the conduct of the other is sufficient to establish the foundation of a judicial proceeding for divorce."

Dr. Guy argues that Mrs. Guy, rather than he, was guilty of desertion, through a series of events culminating on July 23, 1965.

These events include Mrs. Guy's failure to "cooperate with her husband in the family affairs involving the Barabans and the marriage", her failure to visit Dr. Guy during his hospitalization, her retention of New York counsel for the purpose of negotiating a financial arrangement with Dr. Guy, and finally her invitation to Dr. Guy, on his July 23rd visit to Fravon, to stay in the guest room with Russell Wilde. As has been said, evidence was heard *ore tenus* by the chancellor. All conflicts in the evidence have been resolved in favor of Mrs. Guy. Under the evidence adduced we cannot say, as a matter of law, that Mrs. Guy constructively deserted her husband. Accordingly, we hold that the chancellor did not err in awarding alimony.

■ Dr. Guy also claims that the chancellor erred in deciding that certain personalty at Fravon was the sole property of Mrs. Guy. He contends that the court lacked potential jurisdiction to make the adjudication.

The decree provided in part:

"On March 26, 1968 evidence was presented to this Court in the form of an *affadavit* (sic) dated September 12, 1966 which had been previously filed by Dr. Loren P. Guy in a proceeding in the Supreme Court, New York County, State of New York, in which he declared that during his married life he had given his wife, among other things, the furniture and furnishings in the Keswick (Virginia) home costing approximately $50,000.00. On the basis of this evidence and other evidence previously presented to the Court with regard to the ownership of the furniture and furnishings in the home at Keswick, Virginia it is the opinion of the Court and it is accordingly ADJUDGED, ORDERED and DECREED that all the furniture and furnishings now being used as such in the home at Keswick, Virginia, known as 'Fravon' are the sole property of Frances Alexandra Guy."

The question of the court's jurisdiction to decide ownership of property in a divorce proceeding was considered in *Smith* v. *Smith*, 200 Va. 77, 104 S.E.2d 17 (1958). We held, among other things, that the court had jurisdiction to adjudicate that the property was jointly and equally owned, and that Code, § 20-107[1] "does not

---

[1] Code, § 20-107 then provided: "Upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, and upon decreeing that neither party is entitled to a divorce the court may make such further decree as it shall deem expedient concerning the estate and the maintenance of the parties, or either of them, * * *."

limit the jurisdiction of the court to decree only concerning the contingent or marital rights of the parties. If that had been the intention of the legislature, it could have said so in language clear and unmistakable". *Smith* v. *Smith,* Id. at 86, 104 S.E.2d at 25.

After the decision in the *Smith* case, the 1962 General Assembly amended Code, § 20-107 by adding these words: "The word 'estate' as used in this section shall be construed to mean only those rights of the parties created by the marriage in and to the real property of each other." Jurisdiction in divorce suits is purely statutory. *Bray* v. *Landergren,* 161 Va. 699, 704, 172 S.E. 252, 253 (1934). This amendment clearly establishes that the General Assembly did not intend to confer on courts jurisdiction in a divorce suit to enter a decree affecting property rights save those created by the marriage in the real estate of the parties. Such jurisdiction having been withheld by the General Assembly it cannot be conferred by consent or waiver.

Mrs. Guy argues that the chancellor made no "further decree * * * concerning the estate * * * of the parties". She contends the court did nothing more than to recognize that Dr. Guy had given the furniture to her. We do not agree. The language states that it is "ADJUDGED, ORDERED and DECREED that all the furniture and furnishings * * * are the sole property of Frances Alexandra Guy".

Accordingly, we hold that the trial court lacked potential jurisdiction in the divorce proceeding to decide the issue of ownership of the "furniture and furnishings now being used as such" at Fravon, and that that portion of the decree dealing with such property is null and void.

We have considered Appellee's motion to dismiss the appeal for Appellant's failure to comply with Rules 5:1 § 3(f) and 5:12 § 1(c) of Rules of Court and find that it is without merit.

*Affirmed in part;*
*reversed in part.*